DOMINIQUE N. WESTMORELAND, ESQ. (SBN 302606)
E-mail: dwestmoreland@wml-law.com
YESHA H. PATEL, ESQ. (SBN 34676)
E-mail: ypatel@wml-law.com
**THE WESTMORELAND LAW FIRM, P.C.**
609 Deep Valley Drive, Suite 200
Rolling Hills Estates, California 90274
Telephone No.: (424) 285-5362
Facsimile No.:   (424) 285-5825
Attorneys for Plaintiff,
B.B., a minor by and through his Guardian Ad Litem,
LATASHA WHITE

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| B.B. a minor by and through his Guardian Ad Litem, LATASHA WHITE,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF LOS ANGELES; GUILLERMO VIERA ROSA; and DOES 1 through 50, inclusive,<br><br>Defendants. | **Case No.:**<br>**COMPLAINT FOR DAMAGES:**<br><br>1. Violation of Civil Rights – 42 U.S.C. § 1983 (excessive force)<br>2. Violation of Civil Rights – 42 U.S.C. § 1983 (denial of medical care)<br>3. Violation of Civil Rights – 42 U.S.C. § 1983 (unconstitutional conditions of confinement)<br>4. Violation of Civil Rights – 42 U.S.C. § 1983 (14th Amendment – Failure to Protect)<br>5. Violation of Civil Rights – 42 U.S.C. § 1983 (Unconstitutional Policy, Custom or Practice)<br>6. Intentional Infliction of Emotional Distress<br>7. Negligent Supervision, Hiring, and Retention<br>8. Negligence<br>9. Violation of the Bane Act (Cal. Civ. Code § 52.1)<br>10. Negligent Failure to Train, Warn, or Educate<br>11. Violation of Civil Rights - 42 U.S.C. § 1983 (Supervisor Liability)<br>12. Violation of ADA – 42 U.S.C. § 12132<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

- 1 -

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

COMES NOW, Plaintiff B.B., a minor by and through his Guardian Ad Litem, LATASHA WHITE ("Plaintiff"), hereby complains and alleges against Defendant COUNTY OF LOS ANGELES, GUILLERMO VIERA ROSA, and DOES 1 through 50, including, as follows:

## INTRODUCTION

1.    This civil rights action arises out of the failure to protect Plaintiff by Defendants COUNTY OF LOS ANGELES, GUILLERMO VIERA ROSA, and DOES 1 through 50, inclusive, when they knowingly and repeatedly placed Plaintiff in a dangerous situation exposing him to a known and substantial risk of harm from other minor detainees at Los Padrinos Juvenile Hall, and ordering Plaintiff to involuntarily engage in *gladiator fights*[1] with other minors and probation officers, allowing said minors to assault Plaintiff without stepping in or protecting from harm. These multiple beatings caused Plaintiff to be left unconscious with permanent and debilitating bodily injuries, including a potential traumatic brain injury, fractured hand and shoulder.  Plaintiff seeks compensatory damages, punitive damages, attorneys' fees, and costs from Defendants for violating various rights guaranteed to Plaintiff by the United States Constitution and the California Constitution. The Defendants are liable under federal and state laws, including pursuant to Cal. Gov. Code sections 815.2(a) and 820(a), and Cal. Civ. Code sections 51, 51.7 and 52.1. Defendants are liable under 42 U.S.C. section1983 for violations of the Eighth and Fourteenth Amendments to the United States Constitution.

## PARTIES

2.    Plaintiff, B.B., a minor by and through his Guardian Ad Litem, LATASHA WHITE, is and at all times mentioned in this Complaint was, a minor person and resident of Los Angeles County, California. Further, Plaintiff was and has been incarcerated at Los Padrinos from at least 2023 to the present.

3.    Plaintiff is informed and believes that Defendant, COUNTY OF LOS ANGELES ("COLA"), is and at all times mentioned in this Complaint is a government

---

[1] https://oag.ca.gov/news/press-releases/attorney-general-bonta-files-criminal-charges-against-30-officers-role

- 2 -

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

entity that was organized under the laws of the Los Angeles County, State of California. COLA operated the Los Padrinos Juvenile Hall in the City of Downey, California ("Los Padrinos"). Further, COLA is liable for its own conduct and also, vicariously liable for the conduct of its employees, including Los Padrinos.

4.      Plaintiff is informed and believes that Defendant, GUILLERMO VIERA ROSA ("ROSA"), is and at all times mentioned in this Complaint is a government employee employed by COLA and is being sued in his official capacity as Chief Probation Officer. Under ROSA's tenure as Chief Probation Office, he oversaw, supervised and managed Los Padrinos.

5.      Defendants DOES 1 through 50, were individuals, who were the agents, employees, members, volunteers, servants, partners, representatives, independent contractors, joint venturers or other participants with or of Defendants and each of them, and in doing the things hereinafter mentioned, were acting within the course and scope of said agency, employment, membership or other relationship with said Defendants, or causing Defendants to be vicariously liable and/or responsible for the conduct of such DOE defendants described as DOES 1 through 50.

6.      Plaintiff names said Defendants herein, and each of them, because Plaintiff is in doubt and does not know exactly from which Plaintiff herein alleged were caused by the combined negligence of all of the Defendants, and asks that the Court determine the liability of each and all of the Defendants in this action and to what extent and what responsibility falls upon each of said Defendants, and that the Court award judgment to Plaintiff as against such or all Defendants, either jointly or separately, as may be found liable.

## JURISDICTION AND VENUE

7.      This civil action is brought for the redress of alleged deprivations of rights under the laws of the State of California and of constitutional rights protected by 42 U.S.C. §§ 1983, 1985, 1986, 1988, and the Eighth and Fourteenth Amendments to the United States Constitution, and pursuant to the Americans with Disabilities Act 42 U.S.C. §§ 12101 et seq. Jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

8.      Venue is proper in this Court under 28 U.S.C.  section 1391(b), because Defendants reside in, and all incidents, events, and occurrences giving rise to this action occurred in the County of Los Angeles, California.

9.      This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because Plaintiff asserts claims arising under the laws of the United States, including 42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitution. This Court has supplemental jurisdiction over Plaintiff's claims arising under state law pursuant to 28 U.S.C. §§ 1367(a), because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution. Further, Plaintiff presented his government tort claim to the COLA, and the COLA denied the claims. See Cal. Gov't Code §§ 900 et seq.

## VICARIOUS LIABILITY

10.      An employer is responsible for harm caused by the wrongful conduct of its employees, including but not limited to TANEHA BROOKS, SHAWN SMYLES, ISAIAH GOODIE, RAMSES PATRON, JULIAN LIRA, VANESSA WATTANACHINDA-JONES, KENNETH SILVA, ROBERT FORD JR., RENE CONANT JR., LENTON ABRAM, CAIN CABRERA, FLOR SANCHEZ, JACQUELINE RIVERA-CASTILLO, SOPHEA KIET, ARIEL PHELIX ESPINOZA, CHEZZARA Y WHITE, TIMOTHY GOULD, RAYMOND RAMIREZ, EUNICE HUERTA, NANCY SOSTRE, DIANA JACOBO, KENNETH HAYWOOD, BENJAMIN CANO, ROBERT PERKINS, ENRIQUE ALVARANGA, LAFRANCE DAVIS, ANGELINA MEDINA, JESSICA JUAREZ-SERRANO, SERGIO MAGOS, and RANDY BACA,  while acting within the course and scope of their employment. Therefore, COLA is responsible for all of its employee's unlawful conduct that occurred during their course and scope of employment.

11.    Under California law, juvenile halls exist "solely for the purpose of rehabilitation and not punishment.[2]" California requires juvenile detention facilities to provide "safe and supportive homelike environments[s]" that are not treated as "penal institution[s]," (Welfare and Institutions Code §851).

12.    This civil rights action arises from Los Angeles County's longstanding, well-documented, and systemic failure to protect children in its juvenile probation facilities from abuse, neglect, coercion, and unconstitutional conditions of confinement. For decades, Los Angeles County, through its Probation Department and Juvenile Court system, has knowingly maintained facilities where children are subjected to violence, denied basic care, and held in punitive and degrading environments that violate federal and state law.

13.    Rather than protect vulnerable youth, the County has tolerated and enabled a culture of fear and violence, where probation officers regularly use excessive force, facilitate youth-on-youth assaults, coerce silence through threats and retaliation, and neglect the mental and physical health needs of the children in their care.

14.    Los Angeles County operates the most extensive juvenile probation system in the United States, managing multiple youth detention facilities and camps, including Los Padrinos Juvenile Hall. These facilities are operated under the authority of the Los Angeles County Probation Department.

15.    Detention staff regularly fail to intervene in fights, ignore threats of violence, or directly instigate confrontations between detained youth, a practice that observers have compared to "gladiator fights."

16.    Sexual abuse has also been widespread. In 2023, the California DOJ and BSCC found numerous violations of the federal Prison Rape Elimination Act (PREA) in LA County juvenile facilities, including poor supervision, lack of reporting protocols, and credible allegations of staff-perpetrated sexual misconduct, disproportionately involving vulnerable Black male youth.

17.    Despite repeatedly being put on notice through state inspections, lawsuits, grand jury reports, and oversight hearings, Los Angeles County has failed to take

---

[2] People v. Olivas, 17 Cal.3d 236, 254 (1976).

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

reasonable steps to eliminate racially discriminatory practices or protect youth from physical, emotional, psychological, and sexual violence.

18.    Oversight agencies at every level have recognized Los Angeles County's persistent failure to address unlawful and inhumane conditions in the juvenile halls, including the United States Department of Justice, California Attorney General, the Los Angeles Office of the Inspector General, the Los Angeles County Department of Mental Health, the Probation Oversight Commission (POC), and the California Board of State and Community Corrections (BSCC).

19.    Plaintiffs bring this action to hold the County accountable for its deliberate indifference to the health and safety of youth in its custody. Despite over 100 years of notice from federal investigations, state oversight bodies, lawsuits, media exposés, whistleblower complaints, and its internal reports, Los Angeles County has failed to take meaningful, lasting steps to address the endemic abuse, staff misconduct, and dangerous conditions in its juvenile halls and camps.

**A.    The History of Los Angeles's Juvenile Detention Facilities**

20.    Persistent scandals, mismanagement, and institutional failures have plagued Los Angeles County's juvenile probation system. From excessive force and unsanitary conditions to staff misconduct and state noncompliance, the county's facilities have become emblematic of a system in deep crisis.

21.    In 1890, the California State Legislature established the state's first correctional institutions for youth. They are referred to as "reform schools." In 1891, the first such reform school, the Whittier State Reformatory for Boys and Girls, opened.[3] In 1903, the first California probation laws were enacted, and Captain Augustus C. Dodds was appointed the first Los Angeles County Chief Probation Officer. In 1912, A Permanent juvenile detention facility opened on Eastlake Avenue in Los Angeles, the present site of Central Juvenile Hall. The New County Charter named the Probation

---

[3] Daniel Macallair, Grecia Reesendez & Maureen Washburn, *Beyond Repair: Envisioning a Humane Future After 132 Years of Brutality in California's Youth Prisons*, Ctr. on Juvenile & Crim. Just., at 6–7 (June 2023).

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Officer as an administrative officer of the County, and all employees came under the merit system.[4]

22.     In 1914, the state inflicted forced sterilization on poor, primarily non-white youth. In 1919, El Retiro School for Girls was established in Sylmar under the direction of the Probation Committee, which the Board of Supervisors now appoints. In 1920, the Probation staff had grown to 27 Deputy Probation Officers, who handled 1,893 Juvenile Court petitions and 690 adult cases each month. In 1928, the department opened its first branch office in Long Beach. In 1935, the second branch area office opened in Pasadena. In 1938, probation services were made available to the Los Angeles Municipal Courts.[5]

23.     In 1939, the suspicious suicide of a 13-year-old boy amid widespread abuse and mistreatment prompted a state investigation. In 1942, the state reorganized its youth facilities by moving them from the Division of Institutions into a new entity, the California Youth Authority (CYA).[6]

24.     In 1957, Los Padrinos, the second juvenile hall, opened, and the direction of juvenile halls was transferred from the Probation Committee to the Probation Department. In 1960, the Los Angeles County Department underwent a reorganization into new divisional lines, creating Field Services, Juvenile Facilities, Administrative Services, and a Medical Division, with a total staff of 2,200. Five hundred Deputy Probation Officers in Field Services investigated 25,000 adult and 16,500 juvenile cases each year and supervised 24,500 adult and 15,000 juvenile probationers from 11 area offices. One hundred deputies worked with almost 1,000 boys in 10 camps. There were two juvenile halls and one girls' school. In 1965, San Fernando Valley Juvenile Hall opened to provide service to the northeast area of the County and relieve overcrowding at other detention facilities. The total department staff exceeded 3,300 employees

---

[4] Los Angeles Cnty. Probation Dep't, *History of the Department*, Probation (last visited June 11, 2025), https://probation.lacounty.gov/history/.

[5] Los Angeles Cnty. Probation Dep't, *History of the Department*, Probation (last visited June 11, 2025), https://probation.lacounty.gov/history/.

[6] Daniel Macallair, Grecia Reesendez & Maureen Washburn, *Beyond Repair: Envisioning a Humane Future After 132 Years of Brutality in California's Youth Prisons*, Ctr. on Juvenile & Crim. Just., at 6–7 (June 2023).

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

working in 13 area offices, four specialized offices, 14 camps and schools, and four juvenile detention facilities.[7]

25.    In 1970, the Los Angeles County Probation Department was among the "national leaders" in the field of corrections. Almost half of its 4,400 employees were professional Deputy Probation Officers. More than 16,000 juveniles and 53,000 adults were under the guidance, supervision, and care of staff working in 40 locations, including area offices, sub-offices, specialized programs, detention facilities, camps, schools, community day care centers, and aftercare units. In 1975, McLaren Hall in El Monte was transferred to DPSS, and the new Las Palmas School for Girls replaced the old El Retiro School. In 1976, Las Palmas School for Girls was renamed Dorothy Kirby Center in honor of the woman who founded it and served as its Director for 15 years.[8]

26.    In 1980, the probation staff consisted of 3,972 employees working throughout the county in 40 different work locations. In 1983, the Department had 3,204 employees, and more than half of these were Deputy Probation Officers, working in 40 locations. In 1985, a staff of 3,444 employees was working throughout the County in 46 work locations.[9]

27.    In 1982-1988, the Commonweal Research Institute released a series of reports condemning CYA's abusive practices. In 1996, CYA's population reached its peak, exceeding 10,000 youth.[10] In 1999, Staff were found to be punishing youth by denying them food and handcuffing them around the clock. Scandal erupts when the public learns of staff organizing fights between youth in what was referred to as "Friday Night Fights."[11]

28.    In 2000, A female youth sued, alleging she was repeatedly molested by staff. An inspector finds that staff keep some youth in their cells for 23 hours a day. In

---

[7] Los Angeles Cnty. Probation Dep't, *History of the Department*, Probation (last visited June 11, 2025), https://probation.lacounty.gov/history/.
[8] Id.
[9] Id.
[10] Daniel Macallair, Grecia Reesendez & Maureen Washburn, *Beyond Repair: Envisioning a Humane Future After 132 Years of Brutality in California's Youth Prisons*, Ctr. on Juvenile & Crim. Just., at 6–7 (June 2023).
[11] Id.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

2003, A youth commits suicide, the 13th since 1996, and the Prison Law Office sues CYA over poor conditions and rampant violence. In 2004, CYA was placed under a consent decree, which brought routine monitoring and court oversight. Additionally, CJCJ (Center on Juvenile and Criminal Justice) staff testified on the harms of CYA before the State Legislature. In 2005, CJCJ hosts the Restructuring Youth Corrections in California conference and submits a blueprint to the California State Legislature on creating a more humane juvenile justice system and the state reorganizes again, dissolving the CYA and placing its facilities within DJJ, a division of the California Department of Corrections and Rehabilitation, which administers adult prisons.[12]

29.    In 2006, the U.S. Department of Justice (DOJ) began investigating conditions at the County's juvenile camps 2006 after repeated reports of abuses.[13] In 2007, A new law (SB 81) required that counties commit most youth to county facilities rather than the DJJ[14]

30.    In 2008, the DOJ concluded that Los Angeles County was violating the constitutional rights of young people in detention at various facilities, including juvenile probation camps and detention centers. This was due to issues like excessive use of force, violent conditions, and inadequate access to mental health resources and rehabilitative programming. As a result of these findings, the county entered into an agreement with the DOJ in 2008 to resolve the issues and implement reforms. This led to seven years of court oversight. The DOJ's investigation and subsequent agreement addressed issues such as the failure to protect youth from harm by staff (including excessive force and inappropriate use of pepper spray), failure to protect youth from harm

---

[12] Id.

[13] U.S. Dep't of Justice, Civil Rights Div., *Findings Letter to the County of Los Angeles Regarding Youth Camps and Ranches* (Oct. 31, 2008), https://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/lacamps_findings_10-31-08.pdf(last visited June 11, 2025).

[14] Daniel Macallair, Grecia Reesendez & Maureen Washburn, *Beyond Repair: Envisioning a Humane Future After 132 Years of Brutality in California's Youth Prisons*, Ctr. on Juvenile & Crim. Just., at 6–7 (June 2023).

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

by other youth, inadequate staffing and training, and inadequate investigation of abuse allegations.[15]

31.    The use of OC (oleoresin capsicum) spray, commonly known as pepper spray,  in juvenile halls remained a significant issue through the 2010s, with staff routinely deploying it despite calls from medical experts and civil rights groups to ban its use. Youth subjected to spray reported trauma and respiratory distress, and LA County continually delayed promised phase-outs.

32.    In 2011, Governor Jerry Brown signed Assembly Bill 109, the California State Public Safety Realignment Plan. This plan shifted the supervision of individuals who were convicted of non-violent, non-serious, non-high risk sexual offenses from the State Parole's jurisdiction to the local county probation departments throughout the state. Between September and November, the Department received approximately 4,000 former parolees for supervision services.[16]

33.    In 2016, the DJJ was released from the Farrell lawsuit, ending routine monitoring of the facilities.[17] In 2017, investigations into "voluntary probation" programs revealed that thousands of students, many of whom had committed no criminal offenses, were placed under supervision. This punitive model disproportionately targeted students of color and diverted funds from community-based supports to probation officer salaries.[18]

34.    In 2019, the Los Angeles County Office of the Inspector General (OIG) issued a report addressing the increase in pepper spray deployment within the juvenile halls. CJH had approximately 267 chemical force incidents in 2017 and 232 in 2018. BJN had 174 documented chemical force incidents in 2017 and 161 in 2018. The OIG reported that probation staff used pepper spray as a tool to gain compliance from youth. Based on

---

[15] U.S. Dep't of Justice, Civil Rights Div., *Findings Letter to the County of Los Angeles Regarding Youth Camps and Ranches* (Oct. 31, 2008), https://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/lacamps_findings_10-31-08.pdf(last visited June 11, 2025).
[16] Daniel Macallair, Grecia Reesendez & Maureen Washburn, *Beyond Repair: Envisioning a Humane Future After 132 Years of Brutality in California's Youth Prisons*, Ctr. on Juvenile & Crim. Just., at 6–7 (June 2023).
[17] Id.
[18] Lauren Lee White, *Why Are L.A. High Schoolers Getting Probation Without Committing a Crime?*, LA Weekly (July 14, 2017).

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

use-of-force data from the 2017 – 2018 In calendar years, the OIG found that probation staff consistently used pepper spray as an initial or intermediary force option rather than de-escalation strategies. The OIG also reported that staff regularly failed to issue warnings to youth immediately before using pepper spray. Some staff threatened the use of pepper spray as an initial effort to gain compliance, before giving verbal commands.

35.    In 2019, the CJCJ released a scathing account of life inside DJJ facilities since the end of the Farrell lawsuit, detailing staff abuse and a culture of violence. In February 2019, the County Board of Supervisors followed the vast majority of states, and voted to phase out the use of OC spray ("pepper spray") in the juvenile halls based on a well-documented history of excessive and unlawful application of pepper spray against youth, including routine use of pepper spray for minor offenses. Despite the vote to phase out OC Spray, the Board of Supervisors has not provided full funding for the plan, and many of the proposed changes have not been implemented.[19]

36.    In 2020, Governor Gavin Newsom, recognizing its long history of failure and harm, proposed closing DJJ. SB 823 (2020) and SB 92 (2021) outline the shift to an entirely county-based system.[20] State realignment, as outlined in Senate Bill 823, transferred responsibility for serious youth offenders from the state Department of Juvenile Justice (DJJ) facilities to county systems. LA County's inability to meet this new obligation became evident as it struggled to provide secure and rehabilitative environments under the Secure Youth Treatment Facility (SYTF) designation.

37.    In 2021, Dr. Adolfo Gonzales was appointed Chief Probation Officer for the County of Los Angeles, overseeing the nation's largest Probation Department, which has an annual budget of over $1 billion and employs 5,671 positions.[21] Amid escalating

---

[19] Los Angeles Cnty. Auditor-Controller, *Probation Department – Juvenile Institution Cost Savings Review (Report # K20GU) – First and Final Follow-Up Review (June 9, 2020, Board Agenda Item 10)* (June 9, 2020), https://file.lacounty.gov/SDSInter/auditor/audit_reports/1082037_2020-12-3ProbationDepartment_JuvenileInstitutionCostSavingsReview_June9_2020_BoardAgendaItem10_.pdf (Last visited June 11, 2025).

[20] Daniel Macallair, Grecia Reesendez & Maureen Washburn, *Beyond Repair: Envisioning a Humane Future After 132 Years of Brutality in California's Youth Prisons*, Ctr. on Juvenile & Crim. Just., at 6–7 (June 2023).

[21] Los Angeles Cnty. Probation Dep't, *History of the Department*, Probation (last visited June 11, 2025), https://probation.lacounty.gov/history/.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

concerns, Los Angeles County and the County Office of Education entered into a 2021 settlement agreement with the California Department of Justice to address unlawful conditions and inadequate education in juvenile detention. The stipulated judgment required systemic reforms, including better programming, healthcare, and conditions of confinement.[22]

38.    Meanwhile, repeated inspections by the Board of State and Community Corrections (BSCC) found Barry J. Nidorf and Central Juvenile Hall noncompliant in key areas, including safety checks, room confinement, and programming. In October 2021, both were formally deemed unsuitable for youth confinement under California law.[23]

39.    In response, the county attempted to avoid scrutiny by transferring youth from Central to Barry J. Nidorf before scheduled inspections.[24] This maneuver only temporarily delayed state enforcement actions, as both facilities continued to fail inspections well into 2023.

40.    In December 2022, over 300 women filed a lawsuit against the county, alleging they had been sexually abused while incarcerated as juveniles in county-run facilities.[25] This multi-generational abuse lawsuit emphasized the deep-rooted culture of impunity within the probation system.

41.    Facility instability continued into 2023. Probation Chief Adolfo Gonzales was terminated by the Board of Supervisors, and the California Department of Justice

---

[22] Cal. Att'y Gen. Xavier Becerra, *Attorney General Becerra, Los Angeles County Enter into Groundbreaking Settlements to Protect the Rights of Youth in the Juvenile Justice System* (Jan. 13, 2021), https://oag.ca.gov/news/press-releases/attorney-general-becerra-los-angeles-county-enter-groundbreaking-settlements (last visited June 11, 2025).

[23] Cal. Bd. of State & Cmty. Corrs., *BSCC Finds L.A. Juvenile Halls Unsuitable for Confinement of Minors* (Sept. 18, 2021), https://www.bscc.ca.gov/news/bscc-finds-la-juvenile-halls-unsuitable-for-confinement-of-minors/ (last visited June 11, 2025).

[24] Alene Tchekmedyian, *L.A. County's Juvenile Halls Deemed Unsuitable for Youths by State Regulators*, L.A. Times (May 23, 2023), https://www.latimes.com/california/story/2023-05-23/la-county-juvenile-halls-unsuitable.

[25] James Queally, *More than 300 Women Say They Were Abused in L.A. Juvenile Facilities. Their Lawsuit Could Be Just the Start*, L.A. Times (Dec. 6, 2022), https://www.latimes.com/california/story/2022-12-06/abuse-lawsuit-los-angeles-county-juvenile-halls.

- 12 -

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

(DOJ) filed a motion to enforce the 2021 stipulated judgment after finding ongoing illegal conditions in juvenile halls.[26]

42.    In May 2023, Guillermo Viera Rosa was appointed Interim Chief, and the BSCC again declared Barry J. Nidorf and Central Juvenile Halls unsuitable, ordering the relocation of hundreds of youths. The county moved all youth to Los Padrinos Juvenile Hall, a previously closed facility that reopened in July 2023 with 274 youth.[27]

43.    The reopening of Los Padrinos quickly became a disaster. Within months, the BSCC found 22 areas of noncompliance between Los Padrinos and Barry J. Nidorf. These included inadequate staffing, failure to conduct regular safety checks, and improper use of restraints.[28]

44.    Meanwhile, staffing woes worsened. The department suspended dozens of probation officers for failing to report to work, while others were under investigation for misconduct, including sexual abuse of youth in custody. The resulting understaffing created a dangerous and chaotic environment.

45.    In February 2024, the BSCC declared Los Padrinos Juvenile Hall unsuitable in twelve separate regulatory areas. These included violations of standards related to staffing, youth supervision, and excessive confinement in rooms. Simultaneously, Barry J. Nidorf SYTF was found unsuitable in ten areas, including education programs, staffing, and safety checks.[29]

46.    In August 2024, the BSCC issued a formal notice of noncompliance, stating that Los Padrinos violated Title 15, Section 1321, regarding staffing requirements.[30] This

---

[26] Senate Budget & Fiscal Review Subcomm. No. 3 on Health & Human Services & Subcomm. No. 5 on Corrections, Public Safety, Judiciary, Labor & Transportation, *Final Agenda for Joint Hearing on Juvenile Justice Realignment* 8–10 (Feb. 14, 2024), https://sbud.senate.ca.gov/sites/sbud.senate.ca.gov/files/Final.%20Agenda%20Sub3.%20Sub5%20Juvenile%20Justice%20Hearing%2002.14.2024.pdf.
[27] Id.
[28] Id.
[29] Los Angeles County Probation Oversight Commission, *Timeline: Juvenile Justice in Crisis* (Jan. 2024), https://file.lacounty.gov/SDSInter/bos/commissionpublications/internal/1158743_Timeline.pdf.
[30] Id.

- 13 -

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

failure reflected chronic problems hiring and retaining qualified personnel, a theme that persisted throughout 2024.

47.    In October 2024, the BSCC officially declared Los Padrinos unsuitable for juvenile confinement after rejecting the county's Corrective Action Plan (CAP).[31] The plan was faulted for lacking details on how the county would remedy staffing shortfalls, implement service safeguards, and establish clear timelines for compliance. The county was given until December 12, 2024, to resolve the deficiencies.

48.    From December 5 to 6, 2024, the BSCC conducted a follow-up inspection at Los Padrinos at the request of the Probation Department. The inspection confirmed that the facility remained noncompliant with key regulatory standards.[32]

49.    On December 11, 2024, the Probation Department submitted a formal notice of appeal contesting the BSCC's findings of unsuitability. The appeal was part of the department's continued effort to delay mandated depopulation of the facility.[33]

50.    These administrative proceedings culminated in April 2025, when the BSCC Board unanimously upheld the findings of unsuitability and denied the county's appeal. The Board reaffirmed that Los Padrinos violated multiple standards beyond staffing, including regulations related to room confinement, use of force, use of restraints, discipline procedures, and clothing provisions.[34]

51.    In conjunction with regulatory issues, systemic abuse persisted. In March 2025, 30 probation officers were indicted for orchestrating "gladiator fights" among incarcerated youth.[35] This scandal centered on Los Padrinos and revealed a deeply ingrained culture of dehumanization within the department.

52.    These issues were far from isolated. Earlier in the crisis, a 2023 overdose at Barry J. Nidorf Juvenile Hall exposed dangerous lapses in contraband control and

---

[31] Id.
[32] Id.
[33] Id.
[34] Id.
[35] Alene Tchekmedyian, *30 L.A. County Probation Officers Indicted in "Gladiator Fights" Scandal*, L.A. Times (Mar. 12, 2025), https://www.latimes.com/california/story/2025-03-12/la-county-probation-officers-gladiator-fights-indictment.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

youth supervision. A 17-year-old died after ingesting fentanyl in his room, raising alarm about staff shortages and neglect.[36]

53.    The department's internal challenges were compounded by external litigation. In 2024, the county reached a $30 million class-action settlement over allegations that youth had been denied access to restrooms, forced to defecate in containers, and held in squalid conditions.[37]

54.    Meanwhile, BSCC inspections throughout 2024 found repeated instances of falsified records, untrained staff, and excessive force. Inspectors noted that youth often lacked access to education, medical care, and recreation, standards mandated under both state law and the DOJ agreement.[38]

55.    Despite these crises, the county's reform initiative "Youth Justice Reimagined" remained underutilized. A 2024 audit revealed that only 11% of the $88 million in allocated state funds had been spent, further underscoring bureaucratic inertia and inadequate leadership accountability.[39]

56.    In December 2024, just before the court-imposed deadline, the Probation Department's notice of appeal was rejected. The rejection confirmed that Los Padrinos would have to cease operations and transition its youth to alternate placements.[40]

57.    These events coincided with a broader reckoning. In 2025, LA County approved a $4 billion settlement to resolve nearly 7,000 sexual abuse claims, making it the largest such payout in U.S. history. The scale of the settlement reflected decades of

---

[36] Senate Budget & Fiscal Review Subcomm. No. 3 on Health & Human Services & Subcomm. No. 5 on Corrections, Public Safety, Judiciary, Labor & Transportation, *Final Agenda for Joint Hearing on Juvenile Justice Realignment* 8–10 (Feb. 14, 2024), https://sbud.senate.ca.gov/sites/sbud.senate.ca.gov/files/Final.%20Agenda%20Sub3.%20Sub5%20Juvenile%20Justice%20Hearing%2002.14.2024.pdf.

[37] Adrienne M. Byers, *Los Angeles County Claims Board Recommendation: Agustin Herrera, et al. v. County of Los Angeles, et al.*, (Dec. 17, 2024), https://file.lacounty.gov/SDSInter/bos/supdocs/198121.pdf.

[38] Los Angeles County Probation Oversight Commission, *Timeline: Juvenile Justice in Crisis* (Jan. 2024), https://file.lacounty.gov/SDSInter/bos/commissionpublications/internal/1158743_Timeline.pdf.

[39] California State Auditor, *Los Angeles County: It Has Yet to Spend Tens of Millions of Dollars Intended to Provide Services to Realigned Youth*, Report 2023-134, (Aug. 20, 2024), https://www.auditor.ca.gov/reports/2023-134/.

[40] Los Angeles County Probation Oversight Commission, *Timeline: Juvenile Justice in Crisis* (Jan. 2024), https://file.lacounty.gov/SDSInter/bos/commissionpublications/internal/1158743_Timeline.pdf.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

failure to protect youth in custody, the claims date back to 1959, and primarily alleged abuse from the 1980s to the early 2010s.[41]

58.    The culmination of regulatory enforcement, litigation, and criminal charges has made clear that incremental reform is insufficient. The 2021 DOJ stipulated judgment was insufficient to curb the department's systemic failures; enforcement actions were still required into 2025 to ensure compliance.

59.    As of May 2025, following Judge Espinoza's final order, Los Padrinos was under a court-mandated depopulation plan. The Probation Department was instructed to develop placement and transportation plans, including specific provisions for youth with developmental disabilities. However, the department's plan only involved the relocation of 100 youth; therefore, youth continue to be subjected to the heinous conditions at Los Padrinos.[42]

60.    Throughout its existence, Los Angeles County's juvenile probation facilities have been characterized by legal, moral, and operational failures. Despite federal and state intervention, the department has failed to ensure safe, rehabilitative conditions for youth in custody. The cumulative weight of lawsuits, indictments, consent decrees, and state sanctions demands not incremental reform, but wholesale structural transformation. In the meantime, children, the most vulnerable of our population, continue to suffer

**B.    Life in LA County Juvenile Detention Juvenile Intake**

61.    Based on information and belief, upon arriving at Juvenile Hall, youth are placed in an intake unit where they stay for a time ranging from hours to months. Depending on the staff assigned to the intake unit, Youth may be forced to strip naked and take a shower while a probation officer watches them or be subjected to an invasive cavity search. If youth are lucky, they will receive hygiene products, sheets, and clean

---

[41] City News Service, *L.A. County Faces $4 Billion Sex Abuse Settlement Over Juvenile Hall Allegations*, NBC Los Angeles (Apr. 2, 2025), https://www.nbclosangeles.com/news/local/la-county-juvenile-hall-sex-abuse-settlement/3348791/.
[42] James Queally, *Judge Orders More Than 100 Youths Moved Out of Troubled L.A. County Juvenile Hall*, *Los Angeles Times* (May 16, 2025, 1:32 PM PT), https://www.latimes.com/california/story/2025-05-16/los-padrinos-county-juvenile-hall-ruling.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

clothes. Many youth never receive a pillow or a blanket. The violation of Youths rights begins as soon as they walk in the door.[43]

62.    Eventually, youths are assigned to a long-term unit. Despite staff's awareness of the racial hostility between Blacks and Mexicans and the volatility of neighborhood gang rivalries, youth are assigned to units based on age and offense, resulting in many youth being placed in close quarters with their "enemies."

### Pepper Spray

63.    "Pepper spray, or Oleoresin Capsicum (O.C.) spray, is made from capsaicinoids[44] taken from the resin of chili peppers.[45]

64.    Based on information and belief, an alternative form of punishment to gladiator fighting is the use of pepper spray. The use of pepper spray (OC spray) by probation officers in juvenile detention facilities such as Los Padrinos Juvenile Hall is not only widespread, it is often accompanied by a deliberate denial of medical care and decontamination, used to further degrade, punish, and control incarcerated youth.[46] These practices compound the already unconstitutional nature of chemical force and reflect systemic abuse within these institutions. "In both 2004 and 2008, the U.S. Department of Justice cited Los Angeles County's juvenile probation department due to "excessive and inappropriate use of pepper spray on youth"[47]

---

[43] Welfare and Institutions Code § 224.71 states that Youth have a right "(a) To live in a safe, healthy, and clean environment conducive to treatment, positive youth development, and healing and where they are treated with dignity and respect." And that youth have a right "(c) To receive adequate and healthy meals and snacks, clean water at any time, timely access to toilets, access to daily showers, sufficient personal hygiene items, clean bedding, and clean clothing in good repair, including clean undergarments on a daily basis, and new underwear that fits. Clothing, grooming, and hygiene products shall be adequate and respect the child's culture, ethnicity, and gender identity and expression."

[44] Santa Clara County Juvenile Justice Commission. 2014. Use of Oleoresin Capsicum (OC) spray in juvenile hall. San Jose, California. https://www.sccgov.org/sites/bhd/info/MentalHealthBoard/BHB/Documents/2015/BHB-Apr-handouts/ReportOnOCSpray.pdf

[45] British Columbia Drug and Poison Information Centre. 2010. Pepper Spray and Chili Peppers. Vancouver, British Columbia. http://www.dpic.org/faq/pepper-spray-and-chili-peppers

[46] California Board of State and Community Corrections, *Los Padrinos Juvenile Hall Unsuitability Findings Report*, at 18–19 (Apr. 9, 2025), https://www.bscc.ca.gov/wp-content/uploads/LosPadrinosUnsuitabilityFindings2024.pdf.

[47] Loudenback, J. 2018. After feds leave, pepper spray use skyrockets again in L.A.'s juvenile justice system. *The Chronicle of Social Change*. https://chronicleofsocialchange.org/news-2/after-feds-leave-pepper-spray-use-skyrockets-again-in-l-a-s-juvenile-justice-system

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

65.     Pepper spray is regularly used on youth, not in response to immediate threats, but for minor rule violations or verbal defiance, or as a response to fights often instigated or manipulated by staff when the fight does not go as the staff desired.

66.     Worst of all, at times, the pepper spray is used just because the staff can. Reinforcing that youth are never safe from random acts of violence. "Medically, asthma is 40% more prevalent among African Americans than among Caucasians in California,"[48] making black children particularly vulnerable to severe side effects when exposed to O.C. spray."

### Denial of Decontamination as Additional Punishment[49]

67.     After youth are pepper-sprayed, they are frequently denied timely or adequate decontamination, even though OC spray causes Intense burning of the skin, eyes, and airways; difficulty breathing and panic attacks; and risk of long-term harm, especially when not properly treated.

68.     Instead of being taken to showers, provided clean clothing, or given medical attention, many youth report being left in their rooms for hours without ventilation; forced to sit or lie in soiled clothes, intensifying skin exposure; denied showers or eye flushing for prolonged periods; and mocked or taunted by staff during and after the incident.

69.     In some cases, staff deliberately lock youth in confined spaces immediately after spraying them, allowing the chemical to linger in the air and prolonging their suffering. Studies, including scientific randomized trials of different treatment regimens, have found that time is the most important factor in reducing the pain from O.C. exposure[50]

---

[48] Chapman, 2013. Asthma in California: a surveillance report. *California Department of Public Health*, *California Breathing*.
https://www.cdph.ca.gov/Programs/CCDPHP/DEODC/OHB/WRAPP/CDPH%20Document%20Library/Asthma_in_California2013.pdf
[49] Welfare and Institutions Code § 224.71 states that Youth have a right "(b) To be free from physical, sexual, emotional, or other abuse, or corporal punishment."
[50] Barry, JD., Hennessy, R., McManus, JG. 2008. A randomized controlled trial comparing treatment regimens for acute pain for topical oleoresin capsaicin (pepper spray) exposure in adult volunteers. *US National Library of Medicine*. Bethesda, Maryland.

- 18 -

70. This denial of care is not incidental; it functions as a secondary punishment meant to inflict further pain, instill fear, and break youth resistance.

71. The denial of decontamination turns the use of pepper spray into a form of chemical torture, a calculated effort to dominate and silence incarcerated youth through fear, humiliation, and physical suffering.

### Unsanctioned Disturbances aka "Riots"

72. When disturbances, commonly labeled as "riots," break out, staff have repeatedly responded by locking themselves in secured offices, effectively abandoning the youth to chaos, violence, and injury. This practice reflects not only a failure in staff preparedness and training but also a profound breach of the duty of care owed to detained minors.

73. By locking themselves away and removing all adult authority from the scene, staff allow physical violence to escalate unchecked, fueling trauma and distrust among minors who feel completely unprotected. In some cases, youth may damage property or try to flee out of desperation or fear, which further inflames the situation and increases charges or discipline against them, despite staff inaction being the root cause.

74. Ultimately, this shows that staff lack adequate training in crisis response, de-escalation, and trauma-informed care, and operate under policies that prioritize self-protection over youth safety. Rather than managing incidents following legal and professional standards, staff behavior reflects a systemic collapse in operational structure, oversight, and care obligations.

### Staff-on-Youth Violence

75. The use of excessive force by probation staff is a deeply entrenched and troubling practice, contributing to a climate of fear, violence, and trauma for the youth in custody. Reports and testimonies from both current and former detainees reveal a pattern of brutal physical treatment[51], often under the guise of discipline or control, but frequently

---

[51] James Queally, L.A. County Probation Supervisor to Face Charges in Assault of Teen, *L.A. Times* (July 24, 2023), https://www.latimes.com/california/story/2023-07-24/l-a-probation-officer-charged-

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

amounting to unprovoked and retaliatory assaults. Probation officers have been reported to body slam youth onto concrete floors, metal bed frames, or tables during altercations or even in response to minor noncompliance. These slams are not used as a last resort to subdue violent behavior, but rather as a first response or punishment tactic, often resulting in physical injuries such as bruises, concussions, broken bones, or long-term musculoskeletal damage. Youth have reported being body slammed for talking back, refusing to enter their room, or asking questions perceived as insubordinate.

76. Probation staff have been known to use chokeholds and neck restraints, despite these techniques being hazardous and widely condemned in youth correctional settings. These restraints are often applied with excessive duration or pressure, leading to breathing difficulties, loss of consciousness, and in some cases, head trauma. Chokeholds are usually used in retaliation rather than genuine attempts to de-escalate, especially after a youth attempts to defend themselves verbally or physically from other staff or detainees.

77. Among the female staff, slapping across the face, head, or body is frequently described by youth as a favored method used to humiliate or intimidate. These slaps are not always meant to injure but are instead designed to establish dominance, provoke a reaction, or punish perceived disrespect. When youth react to these slaps—verbally or physically—it often becomes the justification for further violence, isolation, or write-ups.

78. Youth are often tackled by multiple staff members, even when they are already restrained or not physically resisting.

79. In many cases, three or more officers will dog-pile onto a youth, regardless of the youth's size or demeanor, and pin them to the floor, sometimes face-down, in a position that restricts breathing.

with-assault-in-beating-of-teen-revealed-by-times-report (describing how multiple officers "piled on top of the youth" and a supervisor bent the teen's legs backward over his head—acts deemed a "brutal assault on a child")

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

80.     Tackling is commonly used during planned or orchestrated incidents, including forced fights, where staff are complicit in instigating violence and then over-responding once a youth retaliates.

81.     Youth are placed in painful physical restraints for prolonged periods, including wrist locks, arm bars, and prone holds that can restrict breathing.

82.     These methods violate established juvenile detention best practices and have been linked to long-term psychological trauma, especially when used on youth with mental health conditions or developmental disabilities.

83.     Staff routinely fail to follow state or county de-escalation protocols, opting instead for immediate physical confrontation.

### Room Confinement

84.     Though strictly limited under many state policies and federal guidance, solitary confinement continues to be used excessively as a form of punishment for minor behavioral issues according to reports from youths. Retaliation against youth who report abuse or challenge staff authority. Control during staff shortages or internal disturbances.

85.     Due to recurring staffing challenges, during these periods of isolation, staff have reportedly refused to allow youth to use the bathroom, even when cells are not equipped with toilets. As a result, youth are forced to defecate or urinate in rubber gloves, Styrofoam cups, or food containers, or left to relieve themselves directly on the floor of their cells. They are subsequently denied cleaning materials, causing feces and urine to remain in the cell for hours or longer.

86.     This treatment is not accidental or unavoidable, but reflects a deliberate denial of humane conditions, often used to humiliate, break down, or punish youth.

### Destruction of Personal Property

87.     It is widely discussed amongst youth that staff destroy youths' personal property, including letters from family, artwork, and personal photos. This also includes revocation of personal hygiene items. This practice is both psychologically abusive and legally problematic, especially when it targets protected communications or sentimental items. The destruction of personal property by staff, either as a form of retaliation, control, or humiliation, further illustrates the punitive and hostile environment within the facility.

- 21 -

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

88.     Youth report that letters from loved ones are torn up, thrown away, or withheld without explanation. In some cases, officers have ripped up photos of family members or drawings sent by siblings, either during random searches or as retaliation for alleged rule violations. These acts are callous, as communication with family is often a youth's only emotional anchor during detention. And phone calls are regularly withheld by staff. The destruction of such items serves to isolate youth, increase despair, and deepen emotional trauma. The destruction of personal belongings is frequently retaliatory, used by staff as an informal punishment or a way to send a message, if youth are perceived as "disrespectful" or "noncompliant." Examples include tearing up birthday cards, flushing letters down the toilet, throwing out journals, or smashing handmade crafts during inspections.

89.     Destroying personal property is not merely an administrative violation; it causes real psychological harm. Youth feel dehumanized and powerless, reinforcing the belief that they have no control over their lives or dignity. It discourages connection with family, reducing external support networks that are crucial to successful rehabilitation and reintegration. These actions frequently trigger or worsen depression, anxiety, PTSD, and behavioral regression, especially for youth with prior trauma or abuse histories.

## Denial of Contact with Attorney

90.     Youths have reported that probation staff delayed or denied access to phones, making it difficult or impossible to call their attorneys. In-person legal visits have been obstructed by the unavailability of staff to escort youth or by overly restrictive visitation policies. During lockdowns or staff shortages (which have been frequent at Los Padrinos), legal visits and phone calls are often suspended altogether, sometimes for days at a time.

91.     Youth and public defenders have alleged that probation staff discouraged youth from requesting legal help, either through verbal intimidation or threats of punishment (such as loss of privileges or room confinement). Some attorneys report being denied meaningful access when attempting to interview clients about abuse or misconduct, raising concerns about obstruction of legal investigations.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

92.    The Board of State and Community Corrections (BSCC) has noted that inadequate staffing at Los Padrinos has resulted in systemic denial of rights, including the failure to facilitate timely attorney contact. These denials are particularly damaging when youth face disciplinary action or are being held in solitary-like conditions, times when legal access is especially critical.

93.    There is no area for youth to conduct private legal calls with their attorney. Despite such space and opportunity being statutorily required.[52]

### Cavity Searches

94.    Numerous Youth have reported that strip searches or cavity searches are used as a retaliatory measure; they serve no legitimate correctional purpose. Instead, they are designed to humiliate, intimidate, and control detainees: youth may be subjected to strip searches or cavity searches after an altercation, some of which are orchestrated by staff. The emotional and psychological harm caused by these types of searches is significant.

95.    For many youth, strip searches and cavity searches can be deeply humiliating experiences that further compound existing trauma, especially for those who have experienced abuse or neglect before detention. The loss of bodily autonomy and the invasion of privacy inherent in these searches create lasting emotional scars that can have long-term effects on mental health. Youth who undergo retaliatory searches often experience heightened levels of stress, anxiety, and fear. They may develop symptoms of post-traumatic stress disorder (PTSD), particularly if they are subjected to these searches frequently or if the searches are aggressively conducted. Cavity searches, in particular, involve the intrusive examination of intimate body parts and can cause physical pain or injury. When conducted recklessly or without justification, these

---

[52] Welfare and Institutions Code § 224.71 mandates that youth have a right "(h) To make and receive confidential telephone calls, send and receive confidential mail, and have confidential visits with attorneys and their authorized representatives, ombudspersons, including the Division of the Ombudsperson of the Office of Youth and Community Restoration, and other advocates, holders of public office, state and federal court personnel, and legal service organizations."

- 23 -

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

procedures are not only harmful but may also violate medical ethics and standards of care.

96.     The systematic use of retaliatory strip and cavity searches contributes to a culture of abuse and fear that permeates the entire facility. This practice reinforces an abusive power dynamic, where staff exert control and punishment through physical violation, undermining any attempt at rehabilitation and encouraging resentment and disillusionment among detainees.

97.     In many cases, retaliatory strip searches and cavity searches are conducted without proper oversight or accountability. Failure to report or document these searches, especially in cases where they are retaliatory, means that staff actions often go unchecked and remain unchallenged, which perpetuates a culture of impunity.

98.     The practice of forced cavity searches has been reported as routine and is particularly disturbing when performed by four or more male probation officers on a single youth. This practice is characterized by Excessive use of force during searches that go far beyond any legitimate security need. No consent from the youth, many of whom report feeling humiliated and degraded during the procedure. A clear power dynamic where youth, especially Black boys, are objectified and treated as less than human, dehumanized in ways that foster ongoing trauma and psychological harm. Racial targeting is evident, as Black youth are disproportionately subjected to these invasive, degrading procedures, compounding the already pervasive racial discrimination in the juvenile justice system.

## No Hugs Policy

99.     Pursuant to Welfare and Institutions Code § 224.71, Youth are explicitly given the right to maintain frequent and continuing contact with parents, guardians, siblings children, and extended family members, through visits, telephone calls, and mail. Youth may be provided with access to computer technology and the internet for maintaining relationships with family as an alternative, but not as a replacement for, in-person visiting. Despite this right being statutorily guaranteed, visits are regularly denied and when allowed, there is a no hugging policy.

- 24 -

100.    The denial of physical affection, specifically the refusal to allow families to hug their children during visitation, further highlights a systemic failure to support family connections and deprives youth of essential emotional and psychological support. This policy, or lack thereof, underscores the institution's punitive focus and its disregard for the well-being of youth, further alienating them from their families and communities, which is detrimental to their rehabilitation and mental health.

101.    Denying families the ability to hug their children during visitation compounds the emotional trauma that minors in detention already experience. This policy limits a vital source of emotional support during visits. Physical touch, like hugging, is a critical component of familial bonding and emotional comfort. It plays a crucial role in fostering trust, affection, and a sense of security for minors. Exacerbates feelings of isolation and abandonment, which are already significant risks for youth in detention. Many of these youth, especially those with histories of trauma, neglect, or abuse, rely on visitation as a chance to reconnect with their families and seek reassurance. Impedes the rehabilitation process by weakening family ties. Studies have shown that strong family connections are crucial to successful reintegration after release. Policies that prevent families from showing physical affection reduce the likelihood that youth will successfully reintegrate into society upon release, as these emotional bonds are not nurtured.

102.    For families, the ability to hug and comfort their children during visits is often one of the few ways to maintain their bond. Restricting physical contact creates an emotional barrier between parents and their children, contributing to the feeling of institutionalized alienation. These families may already face significant stresses and hardships due to having a child in detention, and this policy deepens their sense of powerlessness and frustration. Parents are often denied the chance to reassure their children physically, at a time when their kids need it most. This denial can be particularly painful for families who feel they have limited contact with their children and depend on these brief moments for emotional healing.

103.    This lack of physical affection is a particularly harsh policy for vulnerable youth, especially those who have already experienced trauma or abuse in their home

- 25 -

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

lives, and for whom family visitation may be their only opportunity for a moment of tenderness and reassurance. The restriction of physical affection during visits can have direct consequences on the mental health and behavior of the detained youth. Denying a simple human need for physical comfort can lead to an increase in feelings of helplessness, depression, and anxiety among youth, who often perceive the lack of contact as a form of punishment. Further, it may intensify existing behavioral problems, as youth may lash out or withdraw emotionally due to the added frustration and confusion over being denied a basic human interaction, and decrease the effectiveness of rehabilitation programs. Emotional stability and family support are vital elements of effective rehabilitation, and the removal of these aspects from the visitation process harms the overall recovery process for detained minors.

### Denial of Phone Calls

104.    The regular denial of phone calls as a form of punishment at Los Padrinos Juvenile Hall is yet another abusive practice that deprives youth of critical communication with their families, attorneys, and advocates. This reinforces the punitive, rather than rehabilitative, nature of the facility. This policy is harmful, not only because it limits the youth's access to emotional support but also because it violates their fundamental rights to maintain family relationships during detention. The denial of phone calls is a clear example of how the facility's practices disproportionately impact the mental health and rehabilitation of youth.

### Failure to Report Injuries and Medical Emergencies

105.    Based on information and belief, in LA Juvenile Probation Facilities, staff frequently withhold critical information from parents and guardians about the condition, safety, and well-being of detained youth. This practice includes failing to notify families about injuries, concealing incidents of abuse or violence, and obstructing communication between youth and their loved ones. The deliberate suppression of this information is emotionally devastating for families.

106.    Youth who sustain injuries from fights, use of force by staff, or accidents often receive no external medical evaluation, and their families are never notified. Even when injuries are severe, such as concussions, broken bones, or pepper spray exposure,

- 26 -

parents frequently learn only after the fact, sometimes through court hearings or their child's own delayed account. This failure to notify violates the fundamental rights of parents to be informed about the health and safety of their children, particularly when the child is in state custody. This practice also violates the youths right guaranteed by Welfare and Institutions Code § 224.71(d) "To receive adequate, appropriate, and timely medical, reproductive, dental, vision, and mental health services provided by qualified professionals and consistent with current professional standards of care.

107.    When youth attempt to report abuse whether physical, sexual, or psychological staff often fail to document or report these allegations to parents, mandated reporters, or child welfare agencies, in cases where youth are sexually harassed, assaulted, or subjected to excessive force, parents may remain unaware for months, particularly when youth lack access to unmonitored phone calls or visits. The withholding of this information enables abuse to continue and reflects a systemic culture of secrecy and institutional self-protection.

108.    Staff at Los Padrinos have routinely restricted or revoked phone call privileges, especially for youth who challenge authority, file grievances, or experience abuse, by controlling who a youth can speak to and when, staff are able to suppress disclosures of mistreatment. Parents are often told that their child "doesn't want to talk" or is "on restriction," when in fact, communication is being blocked intentionally. During visitation, physical contact is prohibited, and conversations are often monitored or cut short, further limiting opportunities for disclosure.

109.    Parents and advocates attempting to obtain medical records, behavioral reports, or incident documentation from Los Padrinos are often met with bureaucratic stonewalling. Staff may delay or deny access to important files or provide incomplete information, preventing families from pursuing medical care, education accommodations, or legal remedies on behalf of their children.

110.    Families experience profound distress, helplessness, and betrayal when they discover often too late, that their child has suffered harm in custody. Youth internalize the message that no one is coming to help them, further deepening trauma, distrust of adults, and psychological deterioration. These dynamics fracture familial bonds at a time

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

when positive family connections are one of the few proven protective factors for justice-involved youth.

### Probation Staff, Gang Members

111.    Based on information and belief, Youth are subjected to ongoing abuse and unconstitutional conditions perpetrated and enabled by sworn Los Angeles County Probation Officers who are affiliated with street gangs operating both inside and outside the facility.

112.    It is an open secret that many of the Probation Officers employed at Los Padrinos maintained active or recent ties to known Los Angeles-area street gangs and used their official positions to further gang-related interests within the facility.

113.    These gang-affiliated Probation Officers Coordinated and encouraged violent fights between youth based on gang and racial lines; Used their street gang affiliation to intimidate and control youth in custody; Threatened minors with assault, isolation, or placement in rival gang units if they refused to comply with orders to fight; Facilitated gang retaliation by knowingly housing vulnerable youth with rivals; Displayed gang signs, used gang slang, and referenced specific gang affiliations while on duty;

114.    Retaliated against youth who reported abuse or refused to follow gang-aligned orders.

115.    Probation Officers with known ties to street gangs were protected by a code of silence within the LOS ANGELES COUNTY PROBATION DEPARTMENT. Despite their criminal affiliations and repeated misconduct, these officers were retained, promoted, or reassigned rather than disciplined or terminated.

116.    Supervisors and administrators within the County and Probation Department either knew or were deliberately indifferent to the fact that sworn peace officers under their command were actively engaged in gang-aligned conduct and were using their positions to harm youth in custody.

117.    Defendants COUNTY OF LOS ANGELES and LOS ANGELES COUNTY PROBATION DEPARTMENT maintained policies, customs, and practices that allowed this pattern of abuse and gang corruption to persist, including: Failing to screen or investigate employees for known gang affiliations; Turning a blind eye to obvious signs of

- 28 -

criminal association among sworn officers; Retaliating against whistleblowers or officers who attempted to report misconduct; and Prioritizing institutional reputation over the safety and rights of youth in custody.

### Grievance Forms Not Available to Youth

118.   California Code of Regulations, Title 15, Section 1361 mandates that all youth in juvenile facilities be assured free access to a grievance procedure for fair hearing and resolution of complaints regarding their care and treatment, including mistreatment, harassment, or violation of the nondiscrimination policy. However, Los Padrinos Juvenile Hall has failed to comply, making it more difficult for youth to be able to report the abuses they suffer.

119.   Based on information and belief, grievance forms are not available in youths housing units.

### GENERAL ALLEGATIONS

120.   Plaintiff was detained in Los Padrinos Juvenile Hall. Plaintiff was a minor during his detainment.

121.   Based on information and belief, after being assigned to their long-term unit, the youth will receive a visit from another youth detainee who will inform them of the number of "fades" that the youth has. "Fades" are fights that the youth are forced to participate in by the staff. Generally, the initial fights are against other incarcerated youth who are from rival neighborhoods or a different racial group, the youth's "enemies". However, sometimes the probation officers will force the youth to fight other youth they are friendly and familiar with, just because. To justify such brutality, the Staff explain to kids that these fights are to decrease testosterone and tension. In reality, the initial fights on the first day are used by staff to evaluate the youth's prowess and fighting skills. Youth who prove to be strong fighters are rewarded with chips or candy and eventually the opportunity to become "KP," a coveted position that affords youths special privileges, such as running the phones and receiving extra food.

122.   KPs are used by staff as enforcers. If they are having issues with a youth or are displeased with a youth's behavior, they will have the KP beat them up or order the

- 29 -

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

KP to organize for the youth to be "jumped," which is when multiple youth beat up one youth.

123. The forced participation in fights orchestrated by probation officers serves no legitimate purpose. Instead, the underlying motives behind such conduct reveal a pattern of abuse, dehumanization, and systemic corruption within juvenile detention facilities. For probation staff, these fights serve as a form of illicit entertainment, sometimes involving bets or the offer of food, privileges, or protection as incentives for the best fighters. Probation officers derive personal amusement and sadistic pleasure from watching vulnerable youth physically harm one another.

124. Forcing youth to fight allows officers to reinforce an authoritarian power dynamic and demonstrate absolute control over detainees. By manipulating interpersonal conflicts or creating new ones, probation officers assert dominance and foster an atmosphere of fear and obedience, deterring youth from resisting institutional authority. Officers exploit racial, gang, or personal tensions to sow division, preventing youth from organizing or collectively resisting systemic abuses.

125. Youth who report abuse, refuse orders, or otherwise challenge staff authority may be punished by being forced into fights as a form of retaliation. This tactic intimidates others and coerces silence, reinforcing a culture of fear and impunity within the facility. If a youth refuses to engage in the fights, staff may lock them in their rooms, deny them meals, take away their phone calls, and sometimes arrange for a group of other youth to attack them.[53] By fostering and allowing the violent conditions, officers construct false narratives to justify the need for harsher security measures.

126. The persistence of staff-facilitated "gladiator fights" inside juvenile centers, knowing such actions are on camera, exposes not only systemic impunity but also a disturbing layer of exploitation and entertainment culture within state custody. In some cases, fights are rewatched, recorded, or even distributed on social media, indicating

---

[53] Video Shows L.A. Probation Officers Letting Group Beat Teen in Los Padrinos Juvenile Hall, *L.A. Times*(Apr. 12, 2024), https://www.latimes.com/california/story/2024-04-12/video-shows-l-a-probation-officers-letting-group-beat-teen-in-los-padrinos-juvenile-hall (officers "stood by watching," "laughed," and "shook hands" while a teen was beaten)

- 30 -

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

motivations that go beyond mere control. In theory, camera systems are installed to enhance safety, deter misconduct, and provide accountability. But in practice, their presence has failed to prevent staff from organizing or allowing youth fights. Staff are either unafraid of consequences or actively protected by their superiors. Surveillance footage is often ignored, erased, or manipulated. Supervisors review footage selectively or with willful blindness. Reporting mechanisms are ineffective, retaliatory, or deliberately obstructed.

127.   The fact that youth are being pitted against one another on camera, sometimes while staff are visibly present, demonstrates that visibility alone does not equal accountability in a system where misconduct is tolerated or normalized. The existence of camera footage is no longer a deterrent; instead, it has become part of a closed system of abuse, where harm is documented yet unpunished, further traumatizing youth and emboldening staff.

128.   Violence has become a recreational spectacle for those in power, reinforcing dominance and normalizing brutality. This conduct has transformed juvenile halls from a place of supposed rehabilitation into a controlled environment of state-enabled violence, voyeurism, and coercion, where the tools of oversight are repurposed for abuse.

129.   In or about July 2023, Plaintiff was detainee at Los Padrinos Juvenile Hall, was not permitted to attend school at the facility. This was done despite Plaintiff having an individualized educational program ("IEP"), which Defendants was or should have been aware.

130.   During his entire detainment, Plaintiff was forced to fight staff and other minor detainees.

131.   The gladiator fights would occur in an utility room, utility closet, near the bleachers, in the dining hall and recreational rooms, housing units, amongst other places. Sometimes the fights were captured by surveillance recording systems operated by the facility.

132.   Plaintiff is informed and believes that he was captured on surveillance during these involuntary gladiator fights.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

133. Plaintiff was involuntarily forced to participate in the gladiator fights during the care and supervision of Defendants, who were charged with the responsibility of preventing attacks like this from taking place.

134. Plaintiff is informed and believes that he was involuntarily forced to become a KP, because Defendants' staff forced him to fight new detainees in order to impose and enforce Defendants' rule of law at the facility.

135. If Plaintiff refused to participate in the gladiator fights, Defendants punished him, including but not limiting to taking away his telephone and visitor privileges, food, showers and confinement to his room.

136. During the gladiator fights, Plaintiff suffered bodily injuries including severe injuries and fractures to his upper torso, arms shoulder and head. Further, Plaintiff was forced to seek medical treatment. Even after receiving medical treatment, Defendants continued to force Plaintiff to participate in new gladiator fights.

137. Notably, the facility was closed in 2019, in part due to concerns regarding the inhuman treatment and safety of minors, including minor-on-minor violence at the facility. The facility was subsequently reopened in 2023. In 2024, the facility was ordered to shut down again as a result of inadequate staffing and safety concerns for the detained minors.

138. Further, the facility was also the subject of a federal consent decree and was under a State Department of Justice stipulated judgment in part as a result of its grossly inadequate treatment and protection of minors at the facility.

139. In July 2025, the Attorney General for California made efforts to take over the facility, including placing it under a receivership (the first time ever to happen in the history of California Juvenile Detention's existence).

140. Plaintiff is informed and believes that the events described herein are not the first instance of Defendants' staff allowing and encouraging violence between minor detainees. In fact, there are several similar lawsuits and judgments, including the federal criminal charges brought against individual facility staff members, which placed Defendants on notice of this practice at the facility. Yet, despite these well-known prior

- 32 -

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

and documented prior incidents, Defendants failed to enact and/or enforce policies, procedures and training to prevent this harm from happening to Plaintiff.

### FIRST COUNT

### Violation of Civil Rights – 42 U.S.C. § 1983 - Excessive Force

### (Against All Individual Defendants)

141.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

142.    At all relevant times, Plaintiff was a minor detained at Los Padrinos Juvenile Hall, a juvenile facility operated by the Los Angeles County Probation Department. Plaintiff was in the legal custody and physical control of County officials and staff, including the named Defendants and DOES 1 through 50.

143.    The individual Defendants, while acting under color of state law and within the course and scope of their employment, used excessive and unreasonable force on the Plaintiff. This included, but was not limited to:

- forcing Plaintiff to engage in multiple violent altercations with other youth under staff supervision and coercion;

- threatening and exposing Plaintiff to retaliation if he refused to fight;

- pepper-spraying the Plaintiff and other youth without provocation; and

- subjecting Plaintiff to degrading and unjustified strip and cavity searches.

144.    Defendants organized and facilitated these "fades" or forced fights as a form of punishment, control, or entertainment, completely untethered to any legitimate correctional objective. At no time did Plaintiff pose a threat to himself or others justifying such use of force.

145.    The force used against Plaintiff was objectively unreasonable, excessive, and applied maliciously and sadistically to cause harm. Plaintiff was subjected to at least 15 to 20 forced fights, many of which took place in locations such as linen closets and the recreation yard, where staff knew camera surveillance was limited or nonexistent.

146.    Such force was not only excessive in its physicality but in its psychological impact. After one fight, Plaintiff was mocked, denied medical care, and written up for misconduct, despite being forced into the altercation under threat of further violence.

- 33 -

147. As a result of Defendants' actions, Plaintiff suffered significant physical pain, psychological trauma, and lasting emotional injuries. The conduct of the individual Defendants shocks the conscience and violated Plaintiff's clearly established rights under the Fourteenth Amendment to the United States Constitution.

148. The conduct of the individual Defendants was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Plaintiff, thereby entitling Plaintiff to exemplary and punitive damages.

149. Plaintiff also requests payment by defendants of a reasonable sum of attorney's fees pursuant to 42 U.S.C. § 1988.

### SECOND COUNT
### Violation of Civil Rights – 42 U.S.C. § 1983 - Denial of Medical Care
### (Against All Individual Defendants)

150. Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

151. At all relevant times, Plaintiff was a minor detainee under the care and custody of the Los Angeles County Probation Department. Defendants owed Plaintiff a constitutional duty to provide timely and adequate medical care.

152. Defendants knew that Plaintiff faced serious medical needs and conditions, including:

- physical injuries from repeated fights;
- the psychological aftermath of witnessing his best friend scream in agony from OC spray exposure;
- symptoms of a drug overdose on or about April 11, 2025, which required six doses of Narcan;
- disorientation, confusion, and pain following the overdose and his hospitalization;
- persistent symptoms thereafter which Plaintiff reported to staff but were ignored.

153. Despite these known conditions, Defendants acted with deliberate indifference to Plaintiff's serious medical needs. Instead of responding with urgency,

- 34 -

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Defendants mocked Plaintiff, denied him access to medical professionals, refused to allow him to call his mother, and failed to provide psychological follow-up or emotional support.

154.    Plaintiff was discharged from the hospital and placed on lockdown in the medical module without adequate supervision, support, or access to care. When Plaintiff complained of continued symptoms, he was ignored until he simulated another overdose in desperation to receive treatment.

155.    This indifference extended even to the point of humiliation and cruelty, Defendants openly joked about the number of Narcan doses needed to revive Plaintiff, emphasizing that his life-saving treatment was burdensome and laughable.

156.    The denial of medical care constituted a violation of Plaintiff's rights under the Fourteenth Amendment to the United States Constitution. Plaintiff suffered prolonged and unnecessary pain, emotional distress, and fear for his life as a result.

157.    As a result of Defendants' actions, Plaintiff suffered significant physical pain, psychological trauma, and lasting emotional injuries. The conduct of the individual Defendants shocks the conscience and violated Plaintiff's clearly established rights under the Fourteenth Amendment to the United States Constitution.

158.    The conduct of the individual Defendants was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Plaintiff, thereby entitling Plaintiff to exemplary and punitive damages.

159.    Plaintiff also requests payment by defendants of a reasonable sum of attorney's fees pursuant to 42 U.S.C. § 1988.

**THIRD COUNT**

**Violation of Civil Rights – 42 U.S.C. § 1983 - Unconstitutional Conditions of Confinement**

**(Against All Individual Defendants)**

160.    Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

161.    At all relevant times, Plaintiff was a minor detained at Los Padrinos Juvenile Hall and under the custody and control of Defendants.

- 35 -

162. Plaintiff was subjected to harsh, unsafe, and punitive conditions of confinement, including but not limited to:

- being left in a holding cell for 6 to 8 hours during intake;
- being confined in his room for days without access to basic services;
- being forced into 15 to 20 violent fights, with staff awareness or orchestration;
- exposure to pepper spray and verbal abuse;
- denial of family contact, phone calls, and medical access;
- forced strip searches in public view under degrading and humiliating circumstances;
- exposure to illicit drug distribution and overdoses within the facility.

163. These conditions were not reasonably related to a legitimate governmental objective and were intended to punish and degrade Plaintiff. Such treatment violated Plaintiff's Fourteenth Amendment right to substantive due process and freedom from punishment as a pretrial juvenile detainee.

164. As a result of Defendants' actions, Plaintiff suffered significant physical pain, psychological trauma, and lasting emotional injuries. The conduct of the individual Defendants shocks the conscience and violated Plaintiff's clearly established rights under the Fourteenth Amendment to the United States Constitution.

165. The conduct of the individual Defendants was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Plaintiff, thereby entitling Plaintiff to exemplary and punitive damages.

166. Plaintiff also requests payment by defendants of a reasonable sum of attorney's fees pursuant to 42 U.S.C. § 1988.

**FOURTH COUNT**

**Violation of Civil Rights – 42 U.S.C. § 1983 - 14th Amendment – Failure to Protect**

**(14th Amendment – Failure to Protect – Against All Defendants)**

167. Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

- 36 -

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

168.    This cause of action is brought pursuant to 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments of the United States Constitution. The Due Process Clause of the Fourteenth Amendment to the United States Constitution protects minors from conditions of confinement or failures to prevent harm that amount to punishment without due process, including where Defendants act deliberately indifferent to known risks of harm to detained minors such as Plaintiff. Plaintiff was deprived of his liberty interests and due process rights, and his right to be free from cruel and unusual punishment because it is the duty of the detaining facility or an incarcerating entity to take reasonable measures to guarantee the safety of a detainee and/or prisoner. In this regard, the severe injuries suffered by Plaintiff were cruel and unusual punishment and a deprivation of his liberty interests.

169.    As a direct result of these actions and inactions by Defendants, Plaintiff was allowed to be severely beaten and assaulted by other minors as well as forced to participate in gladiator fights.

170.    Defendant had actual knowledge that Plaintiff was at risk to his safety if left unattended and unsupervised with certain other minor detainees who have a propensity for violence. Yet, despite this knowledge, Defendant continually placed Plaintiff in situations where they knew, or reasonably should have known, were inherently dangerous to his safety and well-being. This includes failing to secure the door to Plaintiff's housing unit, a standard safety precaution, which allowed other detainees unfettered access to Plaintiff in order to further assault and injure him. This also includes taking Plaintiff back to the same area within facility, around the same minor detainees, after Plaintiff had already been assaulted in that location earlier in the day. These defendants were deliberately indifferent to the known risk that Plaintiff would be seriously injured if not kept separate and apart from certain other minor detainees. These actions and omissions on the part of these Defendants were sufficiently harmful to evidence deliberate indifference to Plaintiff's serious risk of harm, and the indifference to Plaintiff's risk of harm as alleged above was substantial.

171.    Defendants thus made intentional decisions regarding Plaintiff's confinement as alleged above. These conditions put Plaintiff at a substantial risk of

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

suffering serious harm. Defendants did not take reasonable measures to protect Plaintiff from this risk despite obvious consequences of not acting upon the series of attacks Plaintiff was subject to, and by not taking action to protect Plaintiff from the same, Defendant caused Plaintiff severe and permanent injuries.

172.   Plaintiff's risk of harm was serious, in that the failure to separate Plaintiff from other minor detainees that previously assaulted and harmed Plaintiff resulted in Plaintiff's severe and permanent injuries.

173.   Plaintiff was entitled to receive protection from the known risk of harm to his safety and well-being while in the care and custody of the Defendants while detained/incarcerated at Los Padrinos. In doing the acts complained of, Defendants failed to protect Plaintiff from a known risk of serious harm in violation of his rights under the Due Process Clause of the Fourteenth Amendment.

174.   Defendants knew that failure to protect Plaintiff could result in Plaintiff being seriously injured or killed, but disregarded that serious risk, directly causing Plaintiff great bodily harm.

175.   Each of the several aforementioned actions and omissions of Defendants along with other undiscovered conduct, shocks the conscience, in that they acted with deliberate indifference to the constitutional rights of Plaintiff. Defendants were deliberately indifferent to a substantial risk of serious harm to Plaintiff. Defendants' conduct served no legitimate penological purpose.

176.   Defendants are liable for the failure to protect Plaintiff, and for his injuries, either because they were integral participants in the failure to protect, or because they failed to intervene to prevent such violations.

177.   As a direct and proximate result of the aforementioned conduct, Plaintiff suffered injuries, including pain and suffering and emotional distress. Further, the nature of these injuries will impact Plaintiff's future educational opportunities and earning capacity.

178.   The conduct of Defendants was willful, wanton, malicious, and done with a reckless disregard for the rights and safety of Plaintiff, and therefore warrants the imposition of exemplary and punitive damages as to these Defendants.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

179. Plaintiff also requests payment by defendants of a reasonable sum of attorney's fees pursuant to 42 U.S.C. § 1988.

### FIFTH COUNT

### Violations of Civil Rights Under 42 U.S.C. §1983 - Unconstitutional Policy, Custom or Practice

### (Against All Defendants)

180. Plaintiff incorporates by reference all prior paragraphs as though fully set forth herein.

181. Defendants acted pursuant to an expressly adopted official policy or a longstanding practice or custom of Defendants, including unconstitutional policies of not adequately separating minor detainees from other detainees who pose a known danger; of failing to secure the doors of minor detainees' living quarters in order to prevent the possibility of assaults and attacks; of not intentionally placing in areas of Los Padrinos where detainees had been previously assaulted and injured; of not placing minor detainees in the immediate presence of other detainees that had previously assaulted and injured; of not properly supervising detainees while in the presence of other detainees; and of not adequately disciplining detainees that commit acts of violence as to deter similar future conduct.

182. On information and belief, Defendants were not disciplined, reprimanded, retrained, suspended, or otherwise penalized in connection with B.B.'s repeated assaults.

183. Defendants, together with various other officials, had either actual or constructive knowledge of the deficient policies, practices and customs alleged in paragraphs above. Despite having knowledge as stated above, these Defendants condoned, tolerated and through actions and inactions thereby ratified such policies. Said Defendants also acted with deliberate indifference to the foreseeable effects and consequences of these policies with respect to the constitutional rights of Plaintiff. and other individuals similarly situated.

184.    Furthermore, the policies, practices, and customs implemented, maintained, and still tolerated by Defendants, were affirmatively linked to and were a significantly influential force behind the injuries of Plaintiff.

185.    The aforementioned acts and omissions caused Plaintiff's pain and suffering, emotional distress and loss of earning capacity. Accordingly, Defendants, are liable to Plaintiff for compensatory damages under 42 U.S.C. § 1983.

## SIXTH COUNT

### Intentional Infliction of Emotional Distress

### (Against All Individual Defendants)

186.    Plaintiff incorporates by reference all prior paragraphs as though fully set forth herein.

187.    Defendants' conduct, including orchestrating forced fights, mocking Plaintiff following a near-fatal overdose, denying medical and emotional support, conducting public strip searches, and facilitating the abuse of other minors, was extreme, outrageous, and beyond the bounds of human decency.

188.    Defendants acted intentionally or with reckless disregard of the probability that their conduct would cause Plaintiff to suffer severe emotional distress.

189.    As a direct and proximate result, Plaintiff did suffer severe and ongoing emotional distress, including symptoms of trauma, fear, depression, and hopelessness.

190.    The conduct of Defendants warrants the imposition of punitive damages to deter such conduct in the future.

## SEVENTH COUNT

### Negligent Supervision, Hiring, and Retention

### (Against All Defendants)

191.    Plaintiff incorporates by reference all prior paragraphs as though fully set forth herein.

192.    At all relevant times, Defendants COUNTY OF LOS ANGELES and DOES 1-40 had a duty to ensure that personnel hired to supervise and care for detained youth were properly screened, trained, supervised, and retained.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

193.    COUNTY and its supervisors failed to adequately investigate, monitor, and discipline employees who:

- organized "fade" fights between minors;
- ignored drug use and distribution;
- mocked overdosing youth;
- violated policies governing privacy, safety, and emergency care;
- conducted illegal strip searches;
- engaged in or permitted youth-on-youth violence.

194.    Defendants knew or should have known that their failure to act posed a foreseeable risk of serious harm to youth like Plaintiff.

195.    As a direct and proximate result of Defendants' negligent supervision, hiring, and retention, Plaintiff suffered physical harm, psychological trauma, and emotional distress.

## EIGHTH COUNT

### Negligence

### (Against All Defendants)

196.    Plaintiff incorporates by reference all prior paragraphs as though fully set forth herein.

197.    At all relevant times, Defendants owed Plaintiff, a minor in their custodial care, a duty to act with reasonable care to ensure his physical and emotional safety, and to comply with California and federal standards of care for juvenile facilities.

198.    Plaintiff was in a special relationship with Defendants, while he was detained at the facility. The special relationship obligated these Defendants to protect Plaintiff from danger, because as a juvenile detainee he was unable to protect himself.

199.    Defendants breached this duty by, among other things:

- permitting and facilitating physical violence among minors;
- ignoring signs of overdose and distress;
- performing humiliating strip searches without legal justification;
- failing to intervene in abuse and psychological trauma;
- failing to adhere to safety protocols.

- 41 -

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

200.    As a direct and proximate result of Defendants' breach of duty, Plaintiff suffered injuries including physical harm, emotional distress, and psychological trauma.

201.    Defendants were subject to liability to Cal. Gov. Code § 815.2(a). Under Section 815.2, Defendants' employees were responsible for their acts and omissions.

### NINTH COUNT

### Violation of the Bane Act - Cal. Civ. Code § 52.1

### (Against All Defendants)

202.    Plaintiff incorporates by reference all prior paragraphs as though fully set forth herein.

203.    The Bane Act protects individuals from interference or attempted interference with their constitutional and statutory rights through threats, intimidation, or coercion.

204.    Defendants violated Plaintiff's rights under the U.S. and California Constitutions, including his rights to bodily integrity, medical care, freedom from excessive force, and freedom from unlawful searches, through coercive and abusive conduct, including:

- threatening and facilitating forced fights;
- denying care after a drug overdose;
- conducting coercive strip and cavity searches;
- intimidating Plaintiff into silence;
- retaliating against him for reporting abuse.

205.    Defendants' conduct was not only unlawful, but carried out with the intent to chill or punish the exercise of constitutional rights.

206.    As a result, Plaintiff suffered damages, including physical injuries, emotional distress, and trauma, and is entitled to compensatory, punitive, and statutory damages under Cal. Civ. Code §§ 52 and 52.1, including reasonable attorney's fees.

207.    Defendants and each of them are vicariously liable for wrongful acts of its employees pursuant to Section 815.2 of Cal. Gov. Code, which provides that a public entity is liable for the injuries caused by its employees within the scope of employment if the employee's acts would subject them to liability.

- 42 -

## TENTH COUNT

### Negligent Failure to Train, Warn, or Educate

### (Against all Defendants)

208.   Plaintiff incorporates by reference all prior paragraphs as though fully set forth herein.

209.   At all relevant times, Defendants had a duty to adequately train, supervise and educate its employees and officers regarding:

- supervision of detained youth;
- use of force and de-escalation;
- emergency medical care;
- constitutional rights of minors in custody;
- the prevention of trafficking, abuse, and coercion;
- lawful and trauma-informed search procedures.

210.   Defendants breached this duty by failing to implement, provide, or enforce sufficient training, education, and oversight. As a result, custodial staff were permitted to engage in egregious misconduct that caused foreseeable harm.

211.   The lack of training and failure to warn staff about the illegality of their conduct was a direct and proximate cause of Plaintiff's physical injuries, emotional distress, and psychological trauma.

212.   Defendants' employees were unfit and incompetent to perform the work for which they were hired.

213.   Defendants knew or should have known that Defendants' employees were unfit and incompetent and that this unfitness or incompetence created particular risks to the minors at facility. The negligence of Defendants in training, supervising and retaining Defendants' employees was a substantial factor in causing the harm of Plaintiff.

214.   Defendants and each of them are vicariously liable for wrongful acts of its employees pursuant to Section 815.2 of Cal. Gov. Code, which provides that a public entity is liable for the injuries caused by its employees within the scope of employment if the employee's acts would subject them to liability.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

**ELEVENTH COUNT**

**Violation of 42 U.S.C. § 1983 - Supervisor Liability**

**(Against All Defendants)**

215.   Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

216.   At all relevant times, Defendants were supervising officials at Los Padrinos Juvenile Hall employed by the Los Angeles County Probation Department and acting under color of state law. Plaintiff is informed and believes, and thereon alleges, that Defendants acted with deliberate indifference to Plaintiff's constitutional rights by failing to prevent, correct, or remedy unlawful acts committed by subordinate staff under their supervision.

217.   Defendants knew or should have known that staff at Los Padrinos were engaging in a longstanding and well-known practice of facilitating organized fights ("fades"), conducting unlawful strip and cavity searches, mocking youth after overdoses, and distributing or enabling access to illicit drugs. Despite this knowledge, Defendants failed to take any reasonable steps to prevent or stop this misconduct.

218.   Rather than respond appropriately to Plaintiff's reports of distress, Defendants transferred him from Unit N to Unit O, knowing, or with reckless disregard for the fact, that Unit O was also known for staff-facilitated fights. After this transfer, Plaintiff was forced into multiple fights, including those occurring in areas not monitored by security cameras (e.g., linen closets and the recreation yard), all of which occurred under the supervision and tolerance of senior staff.

219.   Defendants failed to properly supervise, train, discipline, or intervene against subordinate staff who routinely violated the rights of youth in their care by:

- permitting and encouraging violence among youth;
- failing to respond to serious medical emergencies and overdoses;
- mocking and degrading youth during periods of medical distress;
- subjecting youth to unconstitutional strip and cavity searches;
- denying youth access to family contact and medical/mental health support.

- 44 -

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

220.   Defendants had notice of unconstitutional conditions and staff misconduct through direct observation, incident reports, staff communications, youth complaints, and institutional patterns, yet failed to act. These omissions were the moving force behind the violations of Plaintiff's rights under the Fourteenth Amendment.

221.   The acts and omissions of Defendants amounted to deliberate indifference to the health, safety, and constitutional rights of Plaintiff, who suffered severe physical and psychological injuries as a result.

222.   As a direct and proximate result of the conduct of Defendants. Plaintiff sustained damages including emotional distress, trauma, humiliation, pain, and loss of dignity. Plaintiff is entitled to compensatory damages and, against the individual defendants, punitive damages.

## TWELVETH COUNT

### Violation of 42 U.S.C. § 12132 – Americans With Disabilities Act

### (Against All Defendants)

223.   Plaintiff incorporates by reference each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

224.   Plaintiff is a qualified individual with a mental disability that substantially his learning and mental processing under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131(2).

225.   Due to Plaintiff's disability, he is required to have an IEP.

226.   Defendant is a covered entity for purposes of enforcement of the ADA as explained by regulations promulgated under the law.

227.   Under the ADA, Defendants are mandated to develop effective procedures for the care of mentally disabled minors in its custody, for interactions with individuals with mental disabilities, and to ensure the protection of these minor's personal and civil rights.

228.   In enacting the ADA, Congress found that individuals with disabilities have been isolated and segregated, constituting a form of discrimination that is a pervasive social problem. 42 U.S.C. § 120101(a)(2).

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

229.    Defendants are mandated under the ADA not to discriminate against any qualified individual on the basis of disability in any services or facilities. 42 U.S.C. § 12182(a).

230.    Defendants violated the ADA by: (1) Failing to properly train its employees, including its employees and other Defendants' staff, to respond with appropriate care to individuals with mental health impairments at Los Padrinos, including providing education services for said individuals and providing protection to them from known risks of harm and by providing medical care they are known to need; and (2) Defendants' employees by failing to follow procedures for intervention to provide educational services and prevent or stop attacks on mentally ill detainees who are especially vulnerable to harm.

231.    As a direct and proximate result of Defendants' acts and omissions as alleged above, B.B. was caused to suffer severe emotional distress and mental anguish, pain and suffering. As a result of the injuries sustained by Plaintiff., he is entitled to general and special damages according to proof at the time of trial.

232.    Plaintiff also seeks reasonable attorney's fees and costs under this claim.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for judgment against all Defendants, and each of them, jointly and severally, as follows:

1.      For general damages;

2.      For special damages;

3.      For exemplary damages against those individual defendants in an amount sufficient to deter and to make an example of those Defendants;

4.      Statutory Damages, Civil Penalties, and Equitable Relief as authorized under 42 U.S.C. § 1983, the Bane Act (Cal. Civ. Code § 52.1), California Civil Code § 52.5;

5.      Attorney's Fees and Costs of Suit under 42 U.S.C. § 1988, California Civil Code §§ 52 and 52.1, and any other applicable provision of law;

6.      Pre-judgment and Post-judgment Interest as allowed by law; and

7.      Such other and further relief as the Court may deem just and proper.

- 46 -

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Dated: August 14, 2025                    THE WESTMORELAND LAW FIRM, P.C.

                                          /s/ Dominique N. Westmoreland
                                    By: _____
                                          Dominique N. Westmoreland
                                          Yesha H. Patel
                                          Attorneys for Plaintiff, B.B., a minor by and
                                          through his Guardian Ad Litem,
                                          LATASHA WHITE

- 47 -

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

## DEMAND FOR JURY TRIAL

Plaintiff, B.B., a minor by and through his Guardian Ad Litem, Latasha White, hereby demands a trial by jury on all claims and issues so triable.

Dated: August 14, 2025            THE WESTMORELAND LAW FIRM, P.C.

/s/ Dominique N. Westmoreland
By: _____
Dominique N. Westmoreland
Yesha H. Patel
 Attorneys for Plaintiff, B.B., a minor by
And through his Guardian Ad Litem,
LATASHA WHITE

- 48 -

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL